Good morning, Your Honors, and may it please the Court, Paul Shanehardt from McDermott Will and Emory, on behalf of the Defendant's Appellants. I'm joined in the courtroom today by my colleague, Sarah Hogarth. Defendant's Appellants ask this Court to vacate the preliminary injunction entered by the Central District of California, and in doing so, also to vacate the setting of a bond by the Central District of California. In the alternative, even if this Court chooses to uphold the preliminary injunction itself, that preliminary injunction ought to be suspended and the bond still vacated. The preliminary injunction is suspended for further proceedings on bond. So as you said, bond at an appropriate level to compensate the Defendant's Appellants in the event the preliminary injunction is ultimately found to have been wrongfully entered. This case is not a typical preliminary injunction case. This is not a case in which we have two market competitors that are vying in a marketplace and we are running a significant risk in which one market competitor might be forced out of the marketplace, might experience significant long-term irreparable harm to its business in the marketplace. This is also not a case in which we are faced with a public interest situation, as this is a case in which we have a public interest group seeking to establish a social benefit or to maintain a social benefit that, but for a preliminary injunction, would be gone before any trial could be had in a case. For instance, damage to the environment, the destruction of a building, et cetera. Things that are, in fact, physically irreparable, and as a result, the public interest very much weighs in favor of a preliminary injunction. Instead, this is a case in which we have an employment issue. We have a company that is a 50-year-old family-held business that hired a software developer to make some software, not to sell out to the public, but actually to run a portion of the backbone of the company's business. The company is not a software business. The company is a logistics business. In other words, it takes in imports that come into this country, puts them in warehouses, ultimately boxes some of them up, and ships them on to their ultimate destinations. Over the years, such processes have become increasingly dependent on computers. At one point, physical records were maintained of what was in warehouses. These days, we look to databases. Here's the question I have. If we were to credit on an abuse of discretion standard the district court's determination of likelihood success on the merits, your argument really amounts to what seems to me to be a compulsory license argument, doesn't it? On the likelihood of success point, Your Honor, we actually suggest that Soft Coutures ultimately is going to bear the burden of going through several gates before ultimately establishing ownership over the software industry. I understand, but we're here on abuse of discretion standard, and there's been a determination made on likelihood of success, correct? Yes, Your Honor. There has been a decision on likelihood of success suggesting that Soft Coutures has a likelihood of success establishing ownership. That finding itself fails in at least three regards, in that there is no likelihood of success with respect to the employment status of Mr. Min Win and others who were billing through Soft Coutures. That seems like the weakest argument to me. I mean, the district court, I mean, the court went through all of that, and that doesn't seem like a particularly strong argument, and the district court didn't think so either. Of the likelihood of success arguments, Your Honor, the two strongest at this stage I believe are the irrevocable license argument referring to the asset marketing decision of this court and the contract-based argument focusing on this court's effect associates decision. The contract-based argument, of course, relates to the contracts that Mr. Min Win claims to have entered into with each of the independent developer defendants here, where such contracts actually on their face purport to be work-for-hire contracts, but in a scenario where the independent developer defendants are necessarily independent contractors, such that under the Copyright Act, an independent contractor is never in a work-for-hire status, and those contracts are not effective in, in fact, conveying copyrights from the independent developer defendants to Soft Coutures as a matter of law. Now, explain something to me as a practical matter. You've got two companies here who have been working together for a long time, right? Yes, Your Honor. And now they've come to this parting of the ways, a fork in the road over, you know, after 18 years, this software. In the end, does it boil down to a question of money in terms of who's going to pay how much for the use of this software? Yes, Your Honor, that's exactly what this will boil down to. This is very much a case in which irreparable harm is really a key factor for consideration on the preliminary injunction issue, and there can be no valid finding of irreparable harm. Here, there is no marketplace competition consideration. This is a scenario where we are solely concerned with what is the number to be assigned for use of the software. Both sides claim they're going out of business as a result of this problem, right? It is a likelihood on both sides, Your Honor. And the question then is... So in this, this quest for self-destruction on both parts, you both are going to throw it up to the Ninth Circuit to decide the fate of these companies. Is that basically where we end up? Not exactly, Your Honor. On the defendant's side, at least, the defendants are working actively to try to mitigate the harm that is occurring as a result of the preliminary injunction, and as quickly as possible to put in place alternative software. And in the meantime, hold together a business using bubblegum and Scotch tape. That's in many ways the American way, and they're doing their best. In doing so, they have already incurred costs of in excess of $1 million in hiring outside developers to create yet new software. This of course gets us to the bond issue. Even while a preliminary injunction is in place, defendants are incurring significant costs to try to mitigate the damage to their business as a result of the preliminary injunction, and they have long since already blown through the $75,000 bond that was set by the court. And as this circuit, and pretty well every circuit that has spoken on the issue, has stated consistently in line with the Supreme Court, a bond is ultimately the ceiling for what can be recovered in damages from a wrongfully issued injunction, such that if we get to trial in this matter, and if at trial it is determined that Regal or others of the defendants in fact had valid ownership interests in the software, such that the preliminary injunction would have been found to be wrongfully entered, not as an abuse of discretion, but wrongfully entered because rights would have been vindicated, $75,000 is woefully insufficient to cover the damages at play. The district court judge here provided absolutely no reasoning for an award of a $75,000 bond. Instead, the only finding of fact in the order on modification of bond is a finding of fact that the previously entered bond of $10,000 was found to be insufficient. But there were no factual findings tied to the bond amount of $75,000, and the district court acknowledged in its preliminary injunction order that there was a significant risk that Regal, as one of the defendants, would be driven out of business by the preliminary injunction, and there was no dispute from the plaintiff regarding the amount of overall damage that Regal was likely to incur. Well, what does the record show, if any proceedings are contemplated in the near term, what's going to happen? At the district court, we are midway through discovery. Discovery is slated to close in mid-December, and we're moving on towards trial next summer, I believe. Briefly, Your Honor, I've referenced the irreparable harm issue. I've also referenced the bond issue. Your Honor, Judge McKeown, you have referenced the likelihood of success point. Just briefly, two other points, and then I'll reserve the remainder of my time for rebuttal. The first is as to the balance of hardships. It is, of course, notable that the only Ninth Circuit decision cited by the district court in its brief recitation on the balance of hardships was this court's decision in cadence design. It is notable, of course, that that is a pre-Winter decision, Winter, of course, being the Supreme Court case that affirmed or confirmed, rather, that the preliminary injunction standard actually requires a full consideration of all four preliminary injunction factors, and balance of hardships cannot be presumed or assumed as a result of a likelihood of success on The final point I did want to make is, even in the event the preliminary injunction is not vacated directly by this court, in view of the significant bond issue in play, the preliminary injunction ought to be suspended pending a resetting of bond. On that, I do not see a court decision in this circuit addressing that scenario. In fact, the sole decision of which I am aware on that at this point is the WMS deeming unpublished decision out of the Federal Circuit, which is, of course, referenced in our briefs. Unless your honors have anything further, I will reserve the remainder of my time. Thank you. Good morning. My name is Rex Sears of the firm Mashop Brennan, here today on behalf of plaintiff and appellee Soft Coutures, Inc. May it please the court. So I would like to take up, Judge Parker, begin with your question about proceedings below, and it relates to something that counsel for the defendants reiterated about, a likelihood that Regal will go out of business in the near term. That, of course, is the position that Regal took in opposition to the preliminary injunction and also in support of a higher bond amount. However, we are now six months post-injunction, and as Mr. Chainhart represented to the district court in filings just within the past few weeks, Regal is still in business. Regal still employs its co-defendants. Regal has not made any sort of arrangement with Soft Coutures. In fact, according to the recent filings in the district court, the defendants have no need of Soft Coutures software because it was junk to begin with and they're replacing it rapidly. And in terms of near-term proceedings, we do have a contempt motion that is set to be heard by the district court on November 18th because we believe that the defendants were telling the truth when they said they could not operate their business without using the source code and making some sort of arrangement with Soft Coutures if that would be required, and that they are therefore not in compliance with the injunction, and that's backed up with some photographic evidence that was recently obtained. Let me ask you about the irreparable harm issue. Yes. It does seem to me that the irreparable harm is really a money one, so let me ask you the district courts. He says that the defendant's use of your software threatens you with bankruptcy. How is that? The same way that any theft of productive property could threaten a plaintiff. This is how Soft Coutures made its living, was by licensing the software to Regal for ongoing payments related to ongoing services. If Regal, as it did here, just took the software, stopped paying, Soft Coutures no longer has an income stream. Soft Coutures has, according to the defendants, outstanding liabilities. That is, Soft Coutures, ironically, has been countersued by some of the very defendants who took Soft Coutures' software and gave it to Regal for unpaid invoices. So if Regal was continuing to pay you for use of the software, then does that change the bankruptcy? I mean, it's a question of money, and so often in these things, you know, what you really need is some kind of cross-license arrangement. So it's not clear to me that when you're really looking at primary, you have primarily one customer up to now, right? Soft Coutures, that's correct. And Soft Coutures, one customer is the company represented by this gentleman over here. Correct. One employee? Down to one employee. There used to be, I believe it was seven independent contractors, and it was two or three employees. One of the employees, and I want to say four of the independent contractors. So I'm really hard-pressed to figure out how you've got one employee, and even if you had more, you have one license arrangement with one company. I don't understand the irreparable harm finding by the district court that this erodes your goodwill and relationships with actual and prospective customers. What's the evidence on that? So, the principal finding actually has to do with the likelihood of bankruptcy, and it's simply that, yes, we have a trial set for next summer. There is no way my client is going to get to that trial unless my client can generate revenues. And by taking the software, and under the Supreme Court's Duran v. Salem in Inc. case, if at a point where a deprivation of money turns into a threat of bankruptcy that threatens extinction before a right can be vindicated, that is irreparable harm. Well, you know, of course, in intellectual property cases, since the Supreme Court's decision in the patent case, we've applied these what I would call heightened irreparable harm standards, or at least we've imposed real irreparable harm standards on intellectual property cases. And I'm not sure that this is one where that's been done. If you're correct, how is it that a $75,000 bond is sufficient in light of the claimed harm by the regal people? So under this Court's jurisprudence, under, for example, the Save Our Sonoran case, this Court has not adopted a principle that a bond has to be high enough to cover damages in the event of bond. And, in fact, it has recognized that where a bond set too high would actually close the courtroom doors. No, that's true. But this bond is incredibly low, given at least the numbers and the evidence thrown around in the injunction papers. I mean, $75,000 is very low. So I'm not sure how that can be justified. The district court didn't offer any findings, did it? Not on that specific amount. Not on the bond. No. We did argue, and I assume the district court credited the notion that if the bond were placed at $100 million, which is what was asked for, that that was a request. Well, that may be what would be called a ridiculous request, okay? Yes, yes. So maybe the district court put up its hands and said, well, if you're going to request a ridiculous amount, I'll give a low amount. I don't know. But I am a little bothered by the amount in relation to the arguments made by both parties as to the amount of money that's involved here. So two things on that, and also just to close out the irreparable harm. Irreparable harm is a fact-finding subject to clear error review. And it's also an abuse of discretion standard for the setting of the bond amount. So what the district court had before it was because the defendants did not put in any evidence on bond in their initial papers, he originally set bond for $10,000 and then allowed the defendants to make a showing on bond. And the defendants didn't come in saying, you know what? Our replacement costs over the next year or two are going to be a million or two. They came in and said, it's going to drive us out of business $100 million. That's what they came in and said. And so the district court, following a line of authority that includes, for example, this court's decision in GoTo.com versus Walt Disney, rejected that and said, no, I'm not going to impose a bond amount that closes the doors to the injured party. What is going to be tried next summer? Essentially just the ownership of this intellectual property? That's what I thought. Recently the defendants have ramped up inquiries into various issues that we thought weren't really in play. My take is that they smell blood and they're trying to finish Sofketeers off before we get to trial next summer, which is what the district court is trying to do. The big issue is ownership, correct? Correct. That's my understanding. But recently we've been getting requests for source code and this, that, and the other, which really don't go to the ownership issue. The ownership issue is based on the parties' read factors and on the parties' contracts. And so if that's the case that's going to trial, then that should be what we're looking at. I'm still not entirely clear on what this trial is going to look like. I mean, if it's based on, you know, contracts and documents. If this court were to rule that the district court made a correct determination in its That's not really before us, is it? I think it is because it's alleged as error on defendant's part. But all we would be looking at is whether there's an abuse in finding a likelihood of success. So we wouldn't make a substantive ruling on the work for hire, for example, or the legitimacy of the contract. So if you were to prevail in the appeal, I think what would come out is that the injunction would continue. Very well, Your Honor. And so going back to the question of what trial looks like next summer, we think it should be that simple proceeding that is just the district court, perhaps with the aid of a jury in some respects, making a final determination regarding the read factors and the contracts with the independent contractors, and then damages. That would be what I would expect to be the trial next summer. Other questions? No, it appears not. All right. Let me just touch on a couple things and just round out one observation. And that is I believe it was Judge McKeown pointed out that both parties are saying they're on death's door. And I can tell you that my client has been pushed to extremists, and that was the point of the district court's irreparable harm finding in which, so far as I can tell, no clear error has been shown. And a bond set in the amounts that were requested would finish, would deprive my client of the injunction, and therefore of the only opportunity he has, his company has, that Soft Coutures has, to continue generating revenues and, therefore, make it to trial before it's squeezed out of existence. That takes this out of the run-of-the-mill money damages on both sides scenario. But that's the other side of the coin. You get an injunction, a preliminary injunction before there's any really vetting of the merits, but you've got to be willing to post a bond in case your judge was wrong and you shouldn't have gotten the injunction. Under this court's jurisprudence, as we understand it, this court has stopped short of a rule that requires a bond large enough to cover damages. This was articulated in the Save Our Sonoran case, which was a public interest case, but the principle was not limited to that. The public environmental cases were pointed to as an example. But the problem that's being generated by both of your arguments is that the financial stakes on both sides are substantial and are increasing. There is. So that's an encouragement, a direct encouragement to us from both of you to look at the size of the bond. There is a disparity in the parties' situation. My client, Socketeers, has been deprived of its sole productive property. And there was some mention made of how this is different from your usual case involving market competitors. It's not really. My client has productive property that is how it generates revenue, and it has been deprived of that exclusivity, and that is interfering with its right to generate revenue. And its productive property is software targeted to this particular Regal business? Yes, it is. So one of the difficulties, of course, with the passage of time is if Regal develops its own software, you could be left with a product with very limited market, correct? Yes. Under the papers that Regal has submitted, it's unable to do that for a period of 12 to 18 months. Now it's in opposition to the contempt motion. It's stating a different version of facts, but the original version of facts was that it would require 12 to 18 months. And my client would, therefore, be entitled to damages covering those 12 to 18 months, which would be including a discouragement of profits because those have been identified as a but-for product of the property and so forth. Well, I'm sure that if they develop their own software, it's going to increase the complexity because then it's going to have to be determined whether that was done with access to your source code, et cetera. Correct, correct. Going back to the idea that we should look at the bond amount to cover this, Regal has a way out, and it's not a difficult way out. Return back to where things were before Regal took the source code. Regal took the source code. There is no allegation or argument to say anything other than that as of December 2018, Regal did not have the source code. Regal hired some people away from Softcoteers. They took the source code and took it to Softcoteers. Softcoteers is not threatening to shut Regal down. Softcoteers would do business with Regal willingly for the duration of the litigation up until trial. It's Regal that will not do business with Softcoteers, and that is why the threat is very symmetrical. Thank you. We can't – it's not our – we're not district judges, so it's not our job to in any way sort of talk resolution or settlement. But this case has, I mean, suggestions of a debt spiral. We would be happy to be engaged in productive settlement discussions. We would be happy to. That's not our business. Thank you. Thank you. Thank you. Just a few points briefly, Your Honors. First, on the issue of irreparable harm, there was questioning to counsel for appellees regarding the bankruptcy issue as well as about the issue of goodwill. As noted in our paper and as apparent on the face of the preliminary injunction order, the district court's findings with respect to goodwill reference only the possibility of a loss to goodwill. That exactly is what the Supreme Court in winter took on, and the notion that a mere possibility of irreparable harm does not rise to a significant sufficient level for a finding of irreparable harm. In fact, the standard is likely. Accordingly, as to goodwill, the district court's findings should be disregarded. On the issue of bankruptcy, there's two items worthy of note. Item one, there was no actual substantiated evidence put in record regarding the plaintiff's, plaintiff appellee's financial circumstances, the likelihood of bankruptcy, the timing of bankruptcy, and the circumstances of bankruptcy. There was no more than the statement of counsel in briefing that but for a preliminary injunction, the plaintiff appellee would ultimately enter into bankruptcy. Well, you're their only customer, so. Well, having only one customer at one given time does not. One customer with proprietary custom software. This does not prevent. Maybe it was a bad business model, but that's what it is. That may have been a bad business model a year ago. What's a worse business model is this year not seeking additional business. There has been nothing to suggest that what Soft Coutures was paid for, which was hourly rate services. There was no payment of a licensed royalty fee. There was payment of hourly rate services. That's evidenced in the declarations both of Mr. Nguyen for Soft Coutures and of Mr. Neves for Regal. Both agree all payment was hourly rate for software development services. There's no reason Soft Coutures could not engage in software development services on behalf of any number of possible clients. The concept of a bankruptcy is certainly questionable. But yet beyond that, a preliminary injunction necessarily needs to remedy or mitigate whatever the apparent harm is that the preliminary injunction is targeting. The preliminary injunction here does not even potentially remedy what is identified as irreparable harm to Soft Coutures. The only way, as Mr. Sears notes to this court, that harm could be remedied, is if Regal were to hire Soft Coutures back. There is no term in the preliminary injunction ordering Regal to hire Soft Coutures back, nor would such a term in fact be appropriate. As a result, Regal is very much entitled to choose, even if at risk of its business, to go about holding things together with bubble gum and scotch tape, as I referenced earlier, and to focus its attention on finding replacement software so as to avoid doing business with Soft Coutures again in the future. Accordingly, the preliminary injunction would do nothing to ultimately remedy what has been identified as irreparable harm. On the issue of bond, just briefly, counsel references this court's decision in Save Our Sonoran. As the court is likely aware, in Save Our Sonoran, the Ninth Circuit itself remarked our longstanding precedent that requiring nominal bonds is perfectly proper in public interest litigation. That is the limit of this court's Save Our Sonoran and that line of cases discretionary view on Rule 65C. As it is, Rule 65C on its face does not actually provide for such a public interest option. This court has held that in its precedent for now several decades. What's your estimate of how much an attorney's fees is going to be spent from now through trial on your side? Best estimate would be on the order of an additional probably $2 to $2.5 million. You referenced what you referred to, Your Honor, as the ridiculous amount of the $100 million claim. Regal did, in fact, believe that was a reasonable risk it faced. It is notable, however, that in Mr. Neves' declaration at paragraph 46, this is at ER 797, Mr. Neves also noted that the replacement cost was estimated at $1.4 to $1.6 million, the question being can we keep the company together while we expend that cost so as to put replacement software in place. So if you were to put your replacement software in place plus your attorney's fees, you're looking at $4 million, correct? More or less, Your Honor, yes. And your co-counsel here said he'd be willing to engage in reasonable settlement talks. And so without committing yourself, I assume that would be your position too? At all times, Your Honor, we have been open to reasonable settlement talks.  I don't want to know any details. But if I may briefly, Your Honor, just one additional point on that without divulging anything of settlement talks, the fact that parties are willing on an ongoing basis to enter into settlement for a monetary amount is actually generally noted by courts as a reason not to find irreparable harm. Thank you. With that, Your Honors, thank you. Thank you both for the argument and the briefing. The case just argued of Sofketeers v. Rigo West is submitted and we're adjourned.
judges: Parker, Farris, McKeown